YATES *v.* EVATT, COMMISSIONER, SOUTH CARO-
LINA DEPARTMENT OF CORRECTIONS, ET AL.

No. 89–7691.   Argued January 8, 1991—Decided May 28, 1991

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, STEVENS, O'CONNOR, and KENNEDY, JJ., joined, in all but Part III of which BLACKMUN, J., joined, and in all but n. 6 and Part III of which SCALIA, J., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in Part B of which BLACKMUN, J., joined, *post*, p. 411.

*David I. Bruck,* by appointment of the Court, 498 U. S. 936, argued the cause for petitioner. With him on the briefs were *John H. Blume* and *Christopher D. Cerf.*

*Miller W. Shealy, Jr.,* Assistant Attorney General of South Carolina, argued the cause for respondents. With him on the brief were *T. Travis Medlock,* Attorney General, *pro se,* and *Donald J. Zelenka,* Chief Deputy Attorney General.*

JUSTICE SOUTER delivered the opinion of the Court.†

This murder case comes before us for the third time, to review a determination by the Supreme Court of South Carolina that instructions allowing the jury to apply unconstitutional presumptions were harmless error. We hold that the State Supreme Court employed a deficient standard of review, find that the errors were not harmless, and reverse.

---

*\*Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

*John K. Van de Kamp,* Attorney General of California, *Richard B. Iglehart,* Chief Assistant Attorney General, *John H. Sugiyama,* Senior Assistant Attorney General, *Martin S. Kaye,* Supervising Deputy Attorney General, and *David D. Salmon,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae.*

†JUSTICE BLACKMUN joins all but Part III of this opinion.

# I

## A

Petitioner, Dale Robert Yates, and an accomplice, Henry Davis, robbed a country store in Greenville County, South Carolina. After shooting and wounding the proprietor, petitioner fled. Davis then killed a woman before he was shot to death by the proprietor. Petitioner was arrested soon after the robbery and charged with multiple felonies.[1] Although he killed no one, the State prosecuted him for murder as an accomplice.[2]

The trial record shows that for some time petitioner and Davis had planned to commit a robbery and selected T. P. Wood's Store in Greenville as an easy target. After parking Davis' car outside, they entered the store, petitioner armed with a handgun and Davis with a knife. They found no one inside except the proprietor, Willie Wood, who was standing behind the counter. Petitioner and Davis brandished their weapons, and petitioner ordered Wood to give them all the money in the cash register. When Wood hesitated, Davis repeated the demand. Wood gave Davis approximately $3,000 in cash. Davis handed the money to petitioner and ordered Wood to lie across the counter. Wood, who had a pistol beneath his jacket, refused and stepped back from the counter with his hands down at his side. Petitioner meanwhile was backing away from the counter toward the entrance to the store, with his gun pointed at Wood. Davis told him to shoot. Wood raised his hands as if to protect himself, whereupon petitioner fired twice. One bullet pierced Wood's left hand and tore a flesh wound in his chest, but the other shot missed. Petitioner then screamed, "Let's go," and ran out with the money. App. 57. He jumped into Davis' car on the passenger side and waited. When Davis

---

[1] Petitioner was indicted for murder, armed robbery, assault and battery with intent to kill, and conspiracy.

[2] The State relied on a theory of accomplice liability because South Carolina does not have a felony-murder statute.

failed to emerge, petitioner moved across the seat and drove off.

Inside the store, Wood, though wounded, ran around the counter pursued by Davis, who jumped on his back. As the two struggled, Wood's mother, Helen Wood, emerged from an adjacent office. She screamed when she saw the scuffle and ran toward the two men to help her son. Wood testified that his mother "reached her left arm around and grabbed [Davis]. So, all three of us stumbled around the counter, out in the aisle." *Id.*, at 19. During the struggle, Mrs. Wood was stabbed once in the chest and died at the scene within minutes.[3] Wood managed to remove the pistol from under his jacket and fire five shots at Davis, killing him instantly.

The police arrested petitioner a short while later and charged him as an accomplice to the murder of Mrs. Wood. Under South Carolina law, "where two persons combine to commit an unlawful act, and in execution of the criminal act, a homicide is committed by one of the actors as a probable or natural consequence of those acts *[sic]*, all present participating in the unlawful act are as guilty as the one who committed the fatal act." *State* v. *Johnson*, 291 S. C. 127, 129, 352 S. E. 2d 480, 482 (1987). Petitioner's primary defense to the murder charge was that Mrs. Wood's death was not the probable or natural consequence of the robbery he had planned with Davis. Petitioner testified that he had brought a weapon with him only to induce the store owner to empty the cash register, and that neither he nor Davis intended to kill anyone during the robbery.[4] App. 37, 42–44, 49, 77–78.

---

[3] The pathologist who performed an autopsy on Mrs. Wood testified that the cause of her death was "a penetrating wound of the chest that was narrow and penetrated the full thickness of the chest by probe examination. There were ·no other wounds that I noted on the external surface of the body." App. 32.

[4] Petitioner's second defense was that he had withdrawn from his agreement to commit the robbery when he shouted to Davis, "Let's go," and ran out of the store. Having allegedly withdrawn from the robbery scheme,

The prosecution's case for murder rested on petitioner's agreement with Davis to commit an armed robbery. From this the State argued they had planned to kill any witnesses at the scene, and had thereby rendered homicide a probable or natural result of the robbery, in satisfaction of the requirement for accomplice liability. In his closing argument to the jury, the prosecutor asserted that petitioner and Davis had planned to rob without leaving "any witnesses in the store." They entered the store "with the idea of stabbing the proprietor to death; a quiet killing, with [petitioner's] pistol as a backup." As a result of this agreement, the prosecutor concluded, "[i]t makes no difference who actually struck the fatal blow, the hand of one is the hand of all." *Id.*, at 89. The prosecutor also addressed the required element of malice. "Mr. Yates," he argued, "is equally guilty. The malice required was in his heart," making him guilty of murder even though he did not actually kill the victim. *Id.*, at 83.

The trial judge charged the jury that murder under South Carolina law "is the unlawful killing of any human being with malice aforethought either express or implied." *Id.*, at 95. The judge continued:

> "In order to convict one of murder, the State must not only prove the killing of the deceased by the Defendant, but that it was done with malice aforethought, and such proof must be beyond any reasonable doubt. Malice is defined in the law of homicide as a technical term, which imports wickedness and excludes any just cause or excuse for your action. It is something which springs from wickedness, from depravity, from a depraved spirit, from a heart devoid of social duty, and fatally bent on creating mischief. The words 'express' or 'implied' do not mean different kinds of malice, but they mean dif-

petitioner contended that he was not liable for the subsequent homicide by his former accomplice.

ferent ways in which the only kind of malice known to the law may be shown.

"Malice may be expressed as where previous threats of vengeance have been made or is where someone lies in wait for someone else to come by so that they might attack them, or any other circumstances which show directly that an intent to kill was really and actually entertained.

"Malice may also be implied as where, although no expressed intention to kill was proved by direct evidence, it is indirectly and necessarily inferred from facts and circumstances which are, themselves, proved. Malice is implied or presumed by the law from the willful, deliberate, and intentional doing of an unlawful act without any just cause or excuse. In its general signification, malice means the doing of a wrongful act, intentionally, without justification or excuse.

"I tell you, however, that if the facts proven are sufficient to raise a presumption of malice, that presumption is rebuttable, that is, it is not conclusive on you, but it is rebuttable by the rest of the evidence. I tell you, also, that malice is implied or presumed from the use of a deadly weapon. I further tell you that when the circumstances surrounding the use of that deadly weapon have been put in evidence and testified to, the presumption is removed. And it ultimately remains the responsibility for you, ladies and gentlemen, under all the evidence to make a determination as to whether malice existed in the mind and heart of the killer at the time the fatal blow was struck." *Id.*, at 96–97.

The judge went on to instruct the jury on the theory of accomplice liability. The jury returned guilty verdicts on the murder charge and on all the other counts in the indictment.[5]

---

[5] In this case, petitioner challenges only his murder conviction. Brief for Petitioner 10, n. 5.

The Supreme Court of South Carolina affirmed the conviction, and we denied certiorari. *State* v. *Yates*, 280 S. C. 29, 310 S. E. 2d 805 (1982), cert. denied, 462 U. S. 1124 (1983).

## B

Petitioner thereafter sought a writ of habeas corpus from the State Supreme Court, asserting that the jury charge "that malice is implied or presumed from the use of a deadly weapon" was an unconstitutional burden-shifting instruction both under state precedent, *State* v. *Elmore*, 279 S. C. 417, 308 S. E. 2d 781 (1983), and under our decision in *Sandstrom* v. *Montana*, 442 U. S. 510 (1979). While the state habeas petition was pending, we delivered another opinion on unconstitutional burden-shifting jury instructions, *Francis* v. *Franklin*, 471 U. S. 307 (1985). Although petitioner brought this decision to the attention of the state court, it denied relief without opinion, and petitioner sought certiorari here. We granted the writ, vacated the judgment of the Supreme Court of South Carolina, and remanded the case for further consideration in light of *Francis*. *Yates* v. *Aiken*, 474 U. S. 896 (1985).

On remand, the State Supreme Court found the jury instruction unconstitutional, but denied relief on the ground that its decision in *State* v. *Elmore, supra,* was not to be applied retroactively. Petitioner again sought review here, and again we granted certiorari, *Yates* v. *Aiken*, 480 U. S. 945 (1987), out of concern that the State Supreme Court had not complied with the mandate to reconsider its earlier decision in light of *Francis* v. *Franklin, supra.* *Yates* v. *Aiken*, 484 U. S. 211, 214 (1988). In an opinion by JUSTICE STEVENS, we unanimously held the state court had erred in failing to consider the retroactive application of *Francis*. We then addressed that question and held that *Francis* was merely an application of the principle settled by our prior decision in *Sandstrom* v. *Montana, supra,* and should, for that reason, be applied retroactively in petitioner's habeas pro-

ceeding. We accordingly reversed the judgment of the State Supreme Court and remanded for further proceedings not inconsistent with our opinion. *Yates* v. *Aiken*, 484 U. S., at 218.

On the second remand, the Supreme Court of South Carolina stated that it was "[a]cquiescing in the conclusion that the trial judge's charge on implied malice constituted an improper mandatory presumption." *State* v. *Yates*, 301 S. C. 214, 216–217, 391 S. E. 2d 530, 531 (1989). On reviewing the record, the court found "two erroneous charges regarding implied malice. First, the trial judge charged the 'willful, deliberate, and intentional doing of an unlawful act without any just cause or excuse' [implied malice]. Second, he charged 'malice is implied or presumed from the use of a deadly weapon'. . . ." *Id.*, at 218, 391 S. E. 2d, at 532.

Despite this determination that two jury instructions were unconstitutional, the State Supreme Court again denied relief after a majority of three justices found the instructions to have been harmless error. The court described its enquiry as one to determine "whether it is beyond a reasonable doubt that the jury would have found it unnecessary to rely on the erroneous mandatory presumption regarding the element of malice." *Ibid.* The court then stated that on "the facts of this case, as charged by the trial judge, the element of malice relied on by the State is that of the killer, Henry Davis." *Id.*, at 219, 391 S. E. 2d, at 532. Reviewing the facts, the court stated that "Davis *lunged* at Mrs. Wood with his knife [and] Mrs. Wood fell to the floor from knife *wounds* in her chest and died within moments." *Id.*, at 217, 391 S. E. 2d, at 531 (emphasis added). The court described the crime as "Henry Davis' *brutal multiple stabbing* of Mrs. Wood," and held "beyond a reasonable doubt [that] the jury would have found it unnecessary to rely on either erroneous mandatory presumption in concluding that Davis acted with malice in killing Mrs. Wood." *Id.*, at 219, 391 S. E. 2d, at 532 (emphasis supplied). The state court gave no citation to the record

for its description of Mrs. Wood's death as resulting from a multiple stabbing and multiple wounds.

The remaining two justices on the State Supreme Court dissented. After first expressing doubt that this Court's mandate authorized them to review for harmless error, *id.*, at 222, 391 S. E. 2d, at 534, the dissenters disagreed that the erroneous jury instructions were harmless. They found that the trial judge "failed to articulate that the jury must find the killer acted with malicious intent." Following this error, "the jury could have mistakenly inferred from the confusing instructions that the intent required in order to prove murder was that of Yates because he carried a gun. The unconstitutional instruction which allowed the jury to presume intent . . . would have eclipsed Yates' defense of withdrawal, and prejudiced his right to a fair trial." *Id.*, at 222–223, 391 S. E. 2d, at 534–535.

Because the Supreme Court of South Carolina appeared to have applied the wrong standard for determining whether the challenged instructions were harmless error, and to have misread the record to which the standard was applied, we granted certiorari to review this case a third time. 498 U. S. 809 (1990).

## II

### A

This Court held in *Sandstrom* v. *Montana*, 442 U. S., at 513, 524, that a jury instruction stating that " 'the law presumes that a person intends the ordinary consequences of his voluntary acts' " violated the requirement of the Due Process Clause that the prosecution prove each element of a crime beyond a reasonable doubt. See *In re Winship*, 397 U. S. 358 (1970). We applied this principle in *Francis* v. *Franklin*, 471 U. S. 307 (1985), to instructions that the " 'acts of a person of sound mind and discretion are presumed to be the product of the person's will' and that a person 'is presumed to intend the natural and probable consequences of his acts.' " *Id.*, at 316 (emphasis omitted). Although the jury had been

told that these presumptions were rebuttable, we held them to be as pernicious in this context as conclusive presumptions because they shifted the burden of proof on intent to the defendant. *Id.*, at 316–318.

In charging the jurors on the issue of malice in this case, the trial judge instructed them on two mandatory presumptions, each of which the Supreme Court of South Carolina has since held to be unconstitutional under *Sandstrom* and *Francis*. The jury was told that "malice is implied or presumed" from the "willful, deliberate, and intentional doing of an unlawful act" and from the "use of a deadly weapon." App. 96. With respect to the unlawful act presumption, the jury was told that the "presumption is rebuttable, that is, it is not conclusive on you, but it is rebuttable by the rest of the evidence." *Ibid.* Following the description of the deadly weapon presumption, the jurors were told that it was their responsibility "under all the evidence to make a determination as to whether malice existed in the mind and heart of the killer."[6] *Ibid.*

We think a reasonable juror would have understood the unlawful act presumption to mean that upon introduction of evidence tending to rebut malice, the jury should consider all evidence bearing on the issue of malice, together with the

---

[6] The presumption on the use of a deadly weapon in this case was qualified with the instruction that "when the circumstances surrounding the use of that deadly weapon have been put in evidence and testified to, the presumption is removed." App. 96. This instruction confuses more than it clarifies. The jury could not presume malice under this rule without evidence that a deadly weapon was used. That evidence included a description of the melee in which the stabbing occurred. Yet the jury was told that once such evidence was introduced, the presumption vanished. As a reasonable juror would have understood the instruction, it was inherently contradictory. We think such a juror would have felt obliged to give the presumption some application and accordingly find its "bursting bubble" clause insufficient to correct the error of presuming malice from the use of a deadly weapon. See *Francis* v. *Franklin*, 471 U. S. 307, 322 (1985) ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity").

presumption, which would still retain some probative significance. A reasonable juror would have understood the deadly weapon presumption to mean that its probative force should be considered along with all other evidence tending to prove or disprove malice. Although the presumptions were rebuttable in these ways, the mandate to apply them remained,[7] as did their tendency to shift the burden of proof on malice from the prosecution to petitioner. Respondents do not challenge the conclusion of the Supreme Court of South Carolina that each presumption violated *Sandstrom* and *Francis*, and the constitutionality of neither one is in issue.

## B

Having concluded that the instructions were constitutionally erroneous, the Supreme Court of South Carolina correctly treated them as subject to further review for harmless error, consistently with *Rose* v. *Clark*, 478 U. S. 570, 582 (1986), in which we held that the taint of an unconstitutional burden-shifting jury instruction may be harmless, citing *Chapman* v. *California*, 386 U. S. 18 (1967).[8] The *Chap-*

---

[7] A mandatory presumption, even though rebuttable, is different from a permissive presumption, which "does not require . . . the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and . . . places no burden of any kind on the defendant." *Ulster County Court* v. *Allen*, 442 U. S. 140, 157 (1979). A permissive presumption merely allows an inference to be drawn and is constitutional so long as the inference would not be irrational. See *Francis* v. *Franklin, supra,* at 314–315.

[8] In his opinion concurring in the judgment in *Carella* v. *California*, 491 U. S. 263, 267 (1989), JUSTICE SCALIA noted that the majority opinion in *Rose* v. *Clark*, 478 U. S. 570 (1986), is not entirely consistent in its articulation of the harmless-error standard to be applied to rebuttable presumptions. In fact, the opinion in *Rose* does contain language that, when taken out of context, suggests standards that are both more restrictive and less restrictive than the standard for reviewing rebuttable presumptions that we apply today. Compare *id.*, at 580–581 ("In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury") (emphasis in original), with *id.*, at 579 (rebuttable presumption is harmless error "[w]here a reviewing court can find that the record

*man* test is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, at 24; see *ibid.* (requirement that harmlessness of federal constitutional error be clear beyond reasonable doubt embodies standard requiring reversal if "'there is a reasonable possibility that the evidence complained of might have contributed to the conviction'") (quoting *Fahy* v. *Connecticut*, 375 U. S. 85, 86–87 (1963)); *Arizona* v. *Fulminante*, 499 U. S. 279, 296 (1991) (confession is harmless error if it "did not contribute to [the defendant's] conviction"); *Delaware* v. *Van Arsdall*, 475 U. S. 673, 681 (1986) (*Chapman* excuses errors that were "'harmless' in terms of their effect on the factfinding process at trial").

To say that an error did not "contribute" to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous. When, for example, a trial court has instructed a jury to apply an unconstitutional presumption, a reviewing court can hardly infer that the jurors failed to consider it, a conclusion that would be factually untenable in most cases, and would run counter to a sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given. See *Richardson* v. *Marsh*, 481 U. S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant").

To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that an instruction to

developed at trial establishes guilt beyond a reasonable doubt"). The first statement, by its own terms, would not reflect the appropriate enquiry in every rebuttable presumption case; the second, in isolation, would not be correct, as our opinion today explains.

apply an unconstitutional presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.

Before reaching such a judgment, a court must take two quite distinct steps. First, it must ask what evidence the jury actually considered in reaching its verdict. If, for example, the fact presumed is necessary to support the verdict, a reviewing court must ask what evidence the jury considered as tending to prove or disprove that fact.[9] Did the jury look at only the predicate facts, or did it consider other evidence bearing on the fact subject to the presumption? In answering this question, a court does not conduct a subjective enquiry into the jurors' minds. The answer must come, instead, from analysis of the instructions given to the jurors and from application of that customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so.

Once a court has made the first enquiry into the evidence considered by the jury, it must then weigh the probative force of that evidence as against the probative force of the presumption standing alone. To satisfy *Chapman*'s reasonable-doubt standard, it will not be enough that the jury considered evidence from which it could have come to the verdict without reliance on the presumption. Rather, the issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. Since that enquiry cannot be a subjective one into the jurors'

---

[9] If the presumed fact is not itself necessary for the verdict, but only one of a variety of facts sufficient to prove a necessary element, the reviewing court should identify not only the evidence considered for the fact subject to the presumption, but also the evidence for alternative facts sufficient to prove the element.

minds, a court must approach it by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption. It is only when the effect of the presumption is comparatively minimal to this degree that it can be said, in *Chapman*'s words, that the presumption did not contribute to the verdict rendered.

Because application of the harmless-error test to an erroneous presumption thus requires an identification and evaluation of the evidence considered by the jury in addition to the presumption itself, we need to say a word about an assumption made in many opinions applying the *Chapman* rule, which state that the harmlessness of an error is to be judged after a review of the entire record. See, *e. g.*, *Delaware* v. *Van Arsdall, supra,* at 681 ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt"); *United States* v. *Hasting,* 461 U. S. 499, 509, n. 7 (1983) ("*Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless"). That assumption is simply that the jury considered all the evidence bearing on the issue in question before it made the findings on which the verdict rested. If, on the contrary, that assumption were incorrect, an examination of the entire record would not permit any sound conclusion to be drawn about the significance of the error to the jury in reaching the verdict. This point must always be kept in mind when reviewing erroneous presumptions for harmless error, because the terms of some presumptions so narrow the jury's focus as to leave it questionable that a reasonable juror would look to anything but the evidence establishing the predicate fact in order to

infer the fact presumed.[10]   When applying a harmless-error analysis in presumption cases, therefore, it is crucial to ascertain from the trial court's instructions that the jurors, as reasonable persons, would have considered the entire trial record, before looking to that record to assess the significance of the erroneous presumption.

## C

The Supreme Court of South Carolina failed to apply the proper harmless-error standard to the rebuttable presumptions at issue in this case.   As a threshold matter, the State Supreme Court did not undertake any explicit analysis to support its view of the scope of the record to be considered in applying *Chapman*.   It is even more significant, however, that the state court did not apply the test that *Chapman* formulated.   Instead, the court employed language taken out of context from *Rose* v. *Clark*, 478 U. S. 570 (1986), and sought merely to determine whether it was beyond a reasonable doubt that the jury "would have found it unnecessary to rely" on the unconstitutional presumptions.[11]

---

[10]For reviewing the effect of a conclusive presumption, a restrictive analysis has been proposed that would focus only on the predicate facts to be relied on under the presumption and would require a court to determine whether they "are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact."   *Carella* v. *California,* 491 U. S., at 271 (SCALIA, J., concurring in judgment).   The error is harmless in this situation because it is beyond a reasonable doubt that the jury found the facts necessary to support the conviction.   *Ibid.*   Application of this narrow focus is urged, because the terms of a conclusive presumption tend to deter a jury from considering any evidence for the presumed fact beyond the predicate evidence; indeed, to do so would be a waste of the jury's time and contrary to its instructions. See *Sandstrom* v. *Montana,* 442 U. S. 510, 526, n. 13 (1979).   The same may be true when a mandatory rebuttable presumption is applied in a case with no rebutting evidence, rendering the presumption conclusive in its operation.

[11] The Court's opinion in *Rose* v. *Clark,* 478 U. S., at 583, quotes from the dissent in *Connecticut* v. *Johnson,* 460 U. S. 73, 97, n. 5 (1983) (opinion of Powell, J.), in such a way as to suggest that a reviewing court must de-

Enquiry about the necessity for reliance, however, does not satisfy all of *Chapman*'s concerns. It can tell us that the verdict could have been the same without the presumptions, when there was evidence sufficient to support the verdict independently of the presumptions' effect. But the enquiry will not tell us whether the jury's verdict did rest on that evidence as well as on the presumptions, or whether that evidence was of such compelling force as to show beyond a reasonable doubt that the presumptions must have made no difference in reaching the verdict obtained. Because the State Supreme Court's standard of review apparently did not take these latter two issues into consideration, reversal is required.

## III

Although our usual practice in cases like this is to reverse and remand for a new determination under the correct standard, we have the authority to make our own assessment of the harmlessness of a constitutional error in the first instance. See *Rose* v. *Clark, supra*, at 584. Because this case has already been remanded twice, once for harmless-error analysis, we think we would serve judicial economy best by proceeding now to determine whether the burden-shifting jury instructions were harmless.

We begin by turning to the State's domestic law of accomplice murder and the elements it entails. The State Supreme Court decided that the trial judge "correctly and precisely" charged the jury on "the common law rule of murder," which required proof of malice.[12] *State* v. *Yates*, 280 S. C., at 38, 310 S. E. 2d, at 810. Petitioner was charged as an accomplice to the alleged murder of Mrs. Wood by Davis,

termine only whether "the jury would have found it unnecessary to rely on the presumption," a test less rigorous than the standard imposed by *Chapman*.

[12] "We are of the opinion that the trial judge correctly and precisely determined the applicable law and charged it." *State* v. *Yates*, 280 S. C., at 38, 310 S. E. 2d, at 810.

and the state court determined that on "the facts of this case, as charged by the trial judge, the element of malice relied on by the State is that of the killer, Henry Davis." 301 S. C., at 219, 391 S. E. 2d, at 532.

In light of the fact that the Supreme Court of South Carolina has approved the trial judge's jury instructions, we will accept his charge on malice as the proper statement of South Carolina law on the subject. The trial judge told the jury that malice is the equivalent of an "intention to kill," without legal justification or excuse.[13] There is no question that either presumption on malice could have been employed by the jury in reaching its verdict. The evidence showed clearly that Davis used a deadly weapon, a knife, and intended to commit, and did commit, an unlawful act without legal justification, not only armed robbery, but the killing itself.

The first step in determining whether these instructions contributed to the jury's verdict is to determine what evidence the jury considered on the issue of intent, independently of the presumptions themselves. The record reveals some evidence rebutting malice, including petitioner's testimony that neither he nor Davis intended to kill anyone. This left the jury free to look beyond the unlawful act presumption and to consider all the evidence on malice. The

---

[13] The trial judge told the jury that malice is proved by "circumstances which show directly that an intent to kill was really and actually entertained." Where such direct evidence does not exist, the judge told the jury that an "intention to kill" may be implied "from facts and circumstances which are, themselves, proved." In summing up his definition of murder, the judge stated that there "must be a combination of a previous evil intent and the act which produces the fatal result." App. 96–97. Our reading of the trial judge's charge on malice as requiring an intent to kill is reflected in the prosecutor's argument to the jury that petitioner and Davis entered the store with the intention of killing the proprietor and anyone else inside so as to leave no witnesses. Id., at 85–86. See also State v. Yates, 301 S. C. 214, 223, 391 S. E. 2d 530, 535 (1989) (Toal, J., dissenting) ("[T]he jury must find the killer acted with malicious intent").

jury can reasonably be expected to have done so. Likewise, under the deadly weapon presumption, as we have construed it, the jury was instructed to consider all the evidence, not just the presumption itself. Since we can thus infer with confidence that the jury considered all the evidence tending to prove or disprove Davis' intent to kill, it is correct simply to follow the general rule of the post-*Chapman* cases that the whole record be reviewed in assessing the significance of the errors.

An examination of the entire record reveals that, as to Willie Wood, there was clear evidence of Davis' intent to kill: Instead of leaving the store when he could have, Davis pursued Wood with a deadly weapon in his hand and attacked Wood by jumping on his back. This evidence was enhanced by the fact that Davis had at least two reasons to kill Wood. He could have thought it necessary to avoid being himself killed or injured by Wood, and he also could have thought it necessary to avoid being identified by Wood to the police.

As probative as this was of Davis' intent to kill Wood, however, there was nothing in the instructions that allowed the jurors to consider this evidence in assessing Davis' intent to kill Wood's mother. Application of a theory of transferred intent would, of course, have allowed the jury to equate Davis' malice in accosting Willie Wood with malice in the killing of Mrs. Wood. See 2 C. Torcia, Wharton's Criminal Law § 144 (14th ed. 1979) ("Under the common-law doctrine of transferred intent, a defendant, who intends to kill one person but instead kills a bystander, is deemed the author of whatever kind of homicide would have been committed had he killed the intended victim"); American Law Institute, Model Penal Code § 2.03(2) (1985). But the jury was not charged on a theory of transferred intent, and we are therefore barred from treating evidence of intent to kill Wood as underlying the necessary finding of intent to kill Wood's mother.

The evidence of Davis' intent to kill Mrs. Wood is far less clear. The prosecution argued that petitioner and Davis entered the store with the intention of killing any witnesses they found inside, and while this inference from the evidence was undoubtedly permissible, it was not compelled as a rational necessity. Petitioner testified that neither he nor Davis had planned to kill anyone, and the record shows that petitioner left the store not knowing whether he had, in fact, killed Willie Wood. Petitioner further testified that he heard a woman scream as he left the store, yet the evidence is clear that he made no effort to return and kill her. App. 57, 61. Hence, the jury could have taken petitioner's behavior as confirming his claim that he and Davis had not originally planned to kill anyone whom they might find inside the store.

Nor do the specific circumstances of Mrs. Wood's death reveal anything clear about Davis' intent toward her. The Supreme Court of South Carolina, to be sure, viewed the record as showing that Davis directed his attention specifically to Mrs. Wood, and attacked her with a repetitiveness ruling out the possibility of inadvertence. The state court's majority described Davis as having "lunged at Mrs. Wood with his knife" and inflicted "wounds" to her chest during a "brutal multiple stabbing." 301 S. C., at 217–219, 391 S. E. 2d, at 531–532.

The state court's description of the evidence as tending to prove Davis' malice is not, however, supported by the record. The only eyewitness to the homicide, Willie Wood, testified that it was Mrs. Wood who ran into the store and "reached her left arm around and grabbed" Davis, after which "the three of [them] stumbled around the counter, out in the aisle." There was no other testimony on how Mrs. Wood encountered Davis. The pathologist who performed an autopsy on Mrs. Wood testified that she died of a single wound to the chest and that "[t]here were no other wounds that I noted on the external surface of the body." App. 32.

There was no other testimony or physical evidence that Mrs. Wood suffered any wounds beyond the fatal one to her chest. The record thus does not support the state court's assertion that Davis "lunged" at Mrs. Wood, or its description of Mrs. Wood's "wounds" as resulting from a "multiple stabbing." The prosecutor in his summation even conceded that "it appeared [Mrs. Wood] tried to grab Mr. Davis." *Id.*, at 88. The most that can be said with certainty is that Mrs. Wood joined the struggle between Davis and Wood and was stabbed during the course of it. She could have been killed inadvertently by Davis, and we cannot rule out that possibility beyond a reasonable doubt.

In sum, the evidentiary record simply is not clear on Davis' intent to kill the victim. Without more, we could not infer beyond a reasonable doubt that the presumptions did not contribute to the jury's finding of Davis' intent to kill Mrs. Wood and to the ensuing verdict of petitioner's guilt as Davis' accomplice.

## IV

The burden-shifting jury instructions found to have been erroneous in this case may not be excused as harmless error. The judgment of the Supreme Court of South Carolina is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE BLACKMUN joins as to Part B, concurring in part and concurring in the judgment.

I agree with the Court's carefully constructed methodolgy for determining harmless error with respect to unlawful presumptions, but I disagree concerning its application to the facts of the present case. Unlike the Court, I find the "deadly weapon" presumption harmless; I find the "unlawful act" presumption not harmless, but for reasons other than the Court assigns. I therefore concur in the judgment of

reversal and join all except footnote 6 and Part III of the Court's opinion.

## A

In my view the "deadly weapon" presumption was harmless for the simple reason that it had no application to the facts of the case. It *disappeared* ("burst") "'when the circumstances surrounding the use of [the] deadly weapon [were] put in evidence and testified to.'" *Ante*, at 397 (quoting App. 96).

The Court apparently does not disagree with that, if the jury can be presumed to have taken the "presumption is removed" portion of the instruction seriously. The Court believes, however, that "a [reasonable] juror would have felt obliged to give the presumption some application" because the instructions creating and qualifying it were "inherently contradictory." If they were taken literally, the Court reasons, the very evidence establishing the presumption would cause it to vanish. *Ante*, at 401, n. 6. I find no such contradiction. It seems to me quite possible to prove that a deadly weapon *was used* without proving the *circumstances surrounding* that use. The victim, for example, is found dead of a gunshot wound and the defendant is shown to have been the only person with access to the victim, and to have been in possession of the gun that fired the fatal shot. Or even more simply (and as was the case here), both sides *concede* that a deadly weapon was used. To be sure, a jury would often confront practical difficulty in applying the presumption (as opposed to theoretical difficulty in understanding it, because of its "inherent contradiction"), in that it would frequently be a nice question whether a particular factual showing is only enough to establish use or also enough to establish "circumstances" as well. But I hardly think that is a problem here. Any reasonable juror must have thought that "circumstances surrounding the use" were placed in evidence when the multiple details described in Part I of the Court's opinion were introduced, including the fact that Davis stabbed Mrs. Wood

while engaged in a struggle with her and her son, during which "'all three . . . *stumbled* around the counter, out in the aisle.'" *Ante*, at 395 (quoting App. 19) (emphasis added). If we take the assumption that juries follow their instructions seriously, *Richardson* v. *Marsh*, 481 U. S. 200, 211 (1987), I think we must conclude that this presumption disappeared and was therefore harmless beyond a reasonable doubt.

## B

The "unlawful act" presumption is a different matter. That did not utterly disappear upon the introduction of certain evidence, but was merely, in the words of the instruction, "not conclusive" and was "rebuttable by the rest of the evidence." App. 96. The Court concludes that this was not harmless only after looking to the entire record and determining that it "simply is not clear on Davis' intent to kill the victim," *ante*, at 411. I agree with the Court's conclusion that this presumption was not harmless; but I think that conclusion should have followed no matter what the record contained.

The Court feels empowered to decide this case on the basis of an examination of the record because the jury was "free to look beyond the unlawful act presumption and to consider all the evidence on malice." *Ante*, at 408. I agree that they were free to do so. Indeed, I believe that they *had* to do so. (Surely the instruction that something is "rebuttable" conveys to the reasonable jury that they not merely *may* but *must* determine whether it has been rebutted.) But what is the problem—what makes it in my view utterly impossible to say beyond a reasonable doubt, from an examination of the record, that the jury *in fact* found guilt on a proper basis—is that the jury would have been examining the evidence *with the wrong question in mind*. Not whether it established malice beyond a reasonable doubt, but whether it was sufficient to overcome (rebut) the improper presumption. Or, to put the point differently, even if a reviewing court can prop-

erly assume that the jury made the ultimate factual determination, it cannot assume that it did so using the appropriate burden of proof.   See *Carella* v. *California*, 491 U. S. 263, 273 (1989) (SCALIA, J., concurring in judgment).

Given the nature of the instruction here, then, to determine from the "entire record" that the error is "harmless" would be to answer a purely hypothetical question, viz., whether, if the jury *had been* instructed correctly, it *would have* found that the State proved the existence of malice beyond a reasonable doubt.   Such a hypothetical inquiry is inconsistent with the harmless-error standard announced in *Chapman* v. *California*, 386 U. S. 18, 24 (1967), and reiterated by the Court today.   "[T]he issue under *Chapman* is whether the jury *actually rested* its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption."   *Ante*, at 404 (emphasis added).   See also *Bollenbach* v. *United States*, 326 U. S. 607, 614 (1946) ("[T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials").   While such a hypothetical inquiry ensures that the State has, in fact, proved malice beyond a reasonable doubt, it does not ensure that it has proved that element beyond a reasonable doubt *to the satisfaction of a jury.*

\* \* \*

For the foregoing reasons, I join all except footnote 6 and Part III of the Court's opinion and concur in the judgment of the Court.